# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

DEWAYNE BARBER and                                                                                   PLAINTIFFS
PAULETTE BARBER, husband and wife

v.                                            No. 4:11CV00234 JLH

CHESAPEAKE EXPLORATION, LLC;
BP AMERICA PRODUCTION COMPANY;
and BHP BILLITON PETROLEUM
(FAYETTEVILLE), LLC                                                                                  DEFENDANTS

## OPINION AND ORDER

The issues in this case concern an oil and gas lease in which Dewayne Barber and Paulette Barber granted to Chesapeake Exploration Limited Partnership, now Chesapeake Exploration, LLC, the right to drill for oil and gas on property in Section 26, Township 9 North, Range 6 West, White County, Arkansas. In this action, the Barbers seek a declaration that the lease expired at the end of its primary term of five years. In the alternative, the Barbers seek a declaration that the lease did not include twenty mineral acres that they own in Section 26. The defendants have now moved for summary judgment, which the Barbers obviously oppose. For the reasons that will be explained, the defendants' motion for summary judgment is granted.

## I.

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets this burden,

the nonmoving party must respond by coming forward with specific facts establishing a genuine dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing sufficient to establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

## II.

It is undisputed that Dewayne and Paulette Barber entered into an oil and gas lease with Chesapeake. The lease recites that the agreement was made on June 8, 2005. The acknowledgment recites that the Barbers executed the lease on July 21, 2005. The Barbers say that the acknowledgment is false because they were out of the country on that date, but they admit that they signed the lease and that the lease presented to the Court bears their signatures.

The first issue is whether the lease has expired. Paragraph 1 of the lease provides:

> This lease shall remain in force for a primary term of Five (5) years and as long thereafter as oil, gas or other hydrocarbons are produced from said leased premises or from lands pooled therewith.

Paragraph 9 of the lease provides:

> Notwithstanding anything contained in this Lease to the contrary, it is expressly agreed that if the Lessee shall commence operations as provided herein at any time while this Lease is in force, this Lease shall remain in force and its terms shall

> continue so long as such operations are prosecuted, and if production results therefrom, then as long as production is maintained.

Paragraph 5 of the lease defines "operations" as follows:

> The term "operations" as used herein shall include, without limitation, the following: Commencing, construction of roadways, preparation of drillsite, drilling, testing, completing, reworking, recompleting, deepening, plugging back, repressuring, pressuring maintenance, cycling, secondary recovery operations, or the production of oil or gas, or the existence of a shut-in well capable of producing oil or gas.

Subsequently, SEECO, Inc., secured an order from the Arkansas Oil and Gas Commission dated February 11, 2010 (Order No. 032-2010-01), pooling and integrating unleased mineral interests and uncommitted leasehold working interests for development in a drilling unit consisting of Section 26, Township 9 North, Range 6 West, White County, Arkansas. Pursuant to the provisions of the Order of the Arkansas Oil and Gas Commission, Chesapeake elected to participate in the well proposed by SEECO to the extent of the oil and gas leases that it held covering lands in Section 26, Township 9 North, Range 6 West. SEECO commenced drilling the Peter Harmon 09-06 #1-26H well in Section 26, Township 9 North, Range 6 West on March 21, 2010.

Chesapeake contends that because SEECO began drilling before the expiration of the five-year lease of the Barbers, the lease remains in effect and has not expired, citing *Snowden v. JRE Invs., Inc.*, 2010 Ark. 276, ___ S.W.3d __, 2010 WL 2210644 and *Garner v. XTO Energy*, 2011 Ark. App. 606, 2011 WL 4824319. In those two cases, the Arkansas courts construed leases that were substantially identical to the present lease with respect to the relevant provisions, and in both of those cases the courts construed the leases to mean that if drilling was commenced before the end of the primary term and continued thereafter until the well began producing, the leases continued in effect beyond the end of the primary term.

The Barbers concede that the lease provided that it would remain in force and effect if operations were to begin during the primary term of the lease and continue thereafter if production were to result. They concede that the term "operations" includes drilling. They contend, however, that the drilling by SEECO did not result in continuation of the lease beyond the primary term because the lease requires that the operations be conducted by the lessee in order to continue the lease in effect beyond the primary term. They note that neither *Snowden* nor *Garner* addressed a situation in which the entity that began the operations during the term of the lease was not the lessee.

While it is true that paragraph 9, which is quoted above, provides that the lease will remain in effect if the lessee commences operations during the primary term of the lease, and SEECO is not the lessee, nevertheless other provisions in the lease refute the Barbers' argument. Paragraph 5 of the lease provides, in pertinent part:

> Lessee hereby is given the right at its option, at any time and whether before or after production, to pool for development and operation purposes all or any part or parts of the leased premises or rights therein with any other land in the vicinity thereof . . . .
>
> Operations on any part of any lands so pooled shall, except for the payment of royalties, be considered operations on leased premises under this Lease, and, notwithstanding the status of a well at the time of pooling, such operations shall be deemed to be in connection with a well which is commenced on leased premises under this Lease.

Thus, the lease unambiguously provides that Chesapeake could pool the leased premises with other land in the vicinity for development and operation and that operations on any part of the pooled land would be considered operations under the lease.

Furthermore, an Arkansas statute provides:

> All operations, including, but not limited to, the commencement, drilling, or operation of a well upon any portion of a drilling unit for which an integration order has been entered shall be deemed for all purposes the conduct of operations upon

4

>each separately owned tract and interest in the drilling unit by the several owners thereof.

Ark. Code Ann. § 15-72-305(b) (Repl. 2009). Thus, by statute, SEECO's drilling is "deemed for all purposes the conduct of operations upon" the land leased by the Barbers to Chesapeake. Although the Arkansas courts have not construed section 15-72-305(b), similar statutes in other jurisdictions have been construed to mean that drilling on a portion of a drilling unit for which an integration order has been entered extends the leases on property within the ordered unit. *See Tri M Petroleum Co. v. Getty Oil Co.*, 792 F.2d 558, 561-62 (5th Cir. 1986).

The Barbers assert that the defendants did not raise this defense in their answers as required by the rules of civil procedure and that the Barbers were not made aware of the defense until after the deposition of Dewayne Barber on December 3, 2011, which was two weeks after the deadline for the amendment of pleadings and two days after the discovery deadline. That argument is without merit. The Barbers' initial complaint alleged only that the lease did not include twenty of the mineral acres that they owned; it did not allege that the lease expired at the end of its primary term. The Barbers filed an amended complaint on August 3, 2011, adding a count alleging that the lease expired at the end of its term. In paragraph 15 of the amended complaint, the Barbers alleged that no hydrocarbons were produced from the leased premises or lands pooled therewith before the end of the five-year term in the lease. Paragraph 17 alleged that the lease expired at the end of its term. Chesapeake answered on August 23, 2011. BHP Billiton Petroleum (Fayetteville), LLC, and BP America Production Company filed answers on September 2, 2011, and on September 6, 2011. All three of the answers state in paragraph 15 that the defendants "affirmatively assert that the lease at issue in Plaintiffs' Complaints is held by production by SEECO's Peter Harmon 9-6 1-26H well, which had a spud date of March 21, 2010, prior to the expiration of the oil and gas lease which is

attached as Exhibit A to Plaintiffs' Complaint." All three of the answers denied the allegations in paragraph 17 of the amended complaint. Thus, the defendants affirmatively stated in their answers that operations commenced pursuant to the terms of the lease by virtue of the well drilled by SEECO, and they expressly denied that the lease expired at the end of its term.

For the reasons stated, the defendants' motion for summary judgment is granted on the issue of whether the lease continued in effect beyond its primary term.

### III.

The second issue concerns the extent of the lands leased by the Barbers to Chesapeake. At the time the Barbers entered into the lease with Chesapeake, they believed that they had mineral rights to fifty-nine acres in Section 26. It is undisputed that Chesapeake initially paid the Barbers a bonus of $8,850, calculated at the rate of $150 per acre for fifty-nine acres. Sometime later it was learned that the Barbers actually owned mineral rights to seventy-nine acres in Section 26. Chesapeake eventually discovered the error and in January 2011 sent the Barbers a check for $3,000 to pay the Barbers $150 per acre for the additional twenty mineral acres. The Barbers refused to negotiate the check.

The issue is whether the Barbers leased to Chesapeake the mineral rights to all of the seventy-nine acres in which they owned mineral rights, or only to the fifty-nine mineral acres that they believed that they owned at the time they executed the lease. The lease grants as follows:

> WITNESSETH, that Lessor, for and in consideration of the sum of Ten and More Dollars ($10.00 & more) in hand paid, and of the covenants and agreements hereinafter contained to be performed by the Lessee, does hereby grant, demise, lease and let unto said Lessee exclusively the hereinafter described land, for the purpose of carrying on geological, geophysical, seismic, and other exploration work, and drilling and operating for, producing and saving all of the oil, gas, (including casinghead gas, coal seam gas, coal bed methane gas, helium and all other constituents) and other hydrocarbons, all that certain tract of land, together with any

reversionary rights therein situated in the County of White[,] State of Arkansas, and described as follows:

ALL

of Section 26, Township 9 North, Range 6 West, and containing 640.00 acres, more or less, and also, in addition to the above described land, any and all strips or parcels of land, other than those constituting regular governmental subdivisions, adjoining or contiguous to the above described land and owned or claimed by Lessor, all of the foregoing land being hereinafter referred to as leased premises. It is the intention of the Lessor herein that the leased premises cover and include all lands owned or claimed by Lessor in the above numbered governmental section or sections together with any and all accretions thereto whether or not herein accurately and completely described.

Paragraph 18 of the lease provides:

It is the intent of the Lessor to lease all of Lessor's interest in and to the Section described herein, whether or not the tracts recited hereon are properly described, and further it is understood that this lease includes all rights owned by the Lessor in this section whether or not correctly described and any other properties owned by the Lessor in the drilling and spacing unit for this well, including without limitation, strips, gores, alleyways, roadways, accretions and avulsions.

The granting clause of the lease expressly and unambiguously states that the lessor intends for the leased premises to include all lands that the lessor owns or claims in Section 26, Township 9 North, Range 6 West. Although the legal description in the lease is not specific as to what lands the Barbers owned within Section 26, a conveyance of all that they owned within a specified section is a sufficient conveyance under Arkansas law. *See Ketchum v. Cook*, 220 Ark. 320, 323-24, 247 S.W.2d 1002, 1004 (1952) (a deed conveying all of the grantor's real estate within a specified one-half of a quarter section was a sufficient description); *Turrentine v. Thompson*, 193 Ark. 253, 254, 99 S.W.2d 585, 586 (1936) (a deed conveying all of the grantor's land in Hempstead County, Arkansas, would contain a sufficient legal description); *Snyder v. Bridewell*, 167 Ark. 8, 11, 267 S.W. 561, 562 (1924) (a legal description in a mortgage was sufficient when it described all of the lands owned by the mortgagor in specified counties in Arkansas); *cf. Luthi v. Evans*, 223 .Kan. 622,

625-26, 576 P.2d 1064, 1067-68 (1978) (an oil and gas lease conveying all of the lessor's property in a certain county is valid). Because the lease here unambiguously provides that the lessor intends to include in the lease all of the lessor's property within Section 26, Township 9 North, Range 6 West, and because such a conveyance is valid under Arkansas law, the defendants are entitled to summary judgment on the issue of whether the lease included all of the mineral rights owned by the Barbers in Section 26 or only the fifty-nine acres of which they were aware at the time they signed the lease.

In opposing summary judgment, the Barbers first argue that summary judgment should be denied because they do not believe that the lease that they signed used the word "all" to describe the portion of Section 26 that they were leasing to Chesapeake. Instead, they contend that the lease that they signed had written in that they were leasing fifty-nine acres to Chesapeake. That contention is based upon the deposition testimony of Dewayne Barber. When asked whether the lease before the Court was the lease that he signed, Dewayne Barber testified: "I couldn't swear it is, because it has got 640 acres here, and I think, to my recollection, it was 59 acres is what I signed on the lease. I wouldn't swear to that." After acknowledging that the signatures were those of him and his wife, Dewayne Barber testified that the lease that he and Mrs. Barber signed was placed in a safe at home, but the safe was stolen a few days after the lease was signed. The Barbers then went to the courthouse to obtain file-marked copies of the deeds and leases that had been in the safe, and they obtained the lease that is presently before the Court. They do not have any other lease. Although Mr. Barber testified that he thought that what he signed stated that he was leasing fifty-nine acres, he added, "I wouldn't swear to that." Thus, the Barbers are unable to present any admissible

8

evidence to show that they signed a lease for fifty-nine acres rather than the lease that is before the Court.

The Barbers next argue that the lease is ambiguous because it purports to lease all of Section 26, which consisted of 640 acres, when there is no dispute about the fact that the Barbers did not own all of Section 26. They point out that the lease contains a warranty clause, and it would have made no sense for them to warrant that they had title to 640 acres, when they and Chesapeake knew to the contrary. Thus, the Barbers argue, the Court should "put itself in the position of the parties and interpret the language used in the light of attendant circumstances." *Abbott v. Pearson*, 257 Ark. 694, 700-01, 520 S.W.2d 204, 209 (1975). Assuming, for the sake of argument, that the property description in the lease is in doubt so that the Court may put itself in the position of the parties and interpret the language in the light of attendant circumstances, the Barbers still cannot avoid summary judgment.

Dewayne Barber was asked at his deposition to read the relevant portion of the lease, and then was asked as follows:

> Q     Okay. So, what did that mean to you, or what does that mean to you now?
>
> A     Well, it means that their intent is to claim all the lands that you own in that property, in that section.
>
> Q     So, everything you own in section 26, township nine north, range six west, according to that paragraph, is covered by this lease?
>
> A     That's what they want, yes.

Later in his deposition, Dewayne Barber testified that shortly after the safe was stolen, he and his wife went to the courthouse and obtained copies of all of their deeds and leases. When they did so, they realized that they owned seventy-nine acres in Section 26, not fifty-nine acres. The

Barbers owned all of the property rights, less one-half of the minerals, in a seventy-eight acre tract in Section 26, and they also owned all property rights in a forty-acre tract. The mistake was that they had thought, when they signed the lease with Chesapeake, that they only had one-half of the mineral rights on the forty acres. Mr. Barber testified as follows:

> Q   So, was it within that same few months that you took a look at your deed and saw that you had all the 40 acres –
>
> A   Yes.
>
> Q   – instead of just half?
>
> A   That's right. And we tried to contact them [the agent for Chesapeake], you know, to get it straightened out, and never could get anybody to get back with us.
>
> * * *
>
> Q   . . . And did you just kind of let it slide?
>
> A   Well, then Chesapeake had some people come by to get some right-of-way to lay a pipeline.
>
> Q   Right.
>
> A   So, I mentioned it to them.
>
> Q   Do you remember who they were?
>
> A   No. It was just a right-of-way agent.
>
> Q   Okay.
>
> A   And they don't – they haven't responded, or they didn't communicate it any further, evidently.
>
> Q   And when, about, was that?
>
> A   Oh, it has been, what, two years ago or so, two, two and a half.
>
>> MS. BARBER: We told the seismograph people, though, when they first came out to explore, we told them that.
>> THE WITNESS: Yeah, told the seismograph people, as well.
>> * * *

> Q      . . . So, basically, every time you saw somebody that was a contractor for or an agent for Chesapeake, you tried to tell them, say, "Hey, you didn't pay me for my 20 acres"; is that right?
>
> A      That's right, we did.

The testimony of Mr. Barber, as well as the comment on the record of Mrs. Barber, show that they believed that the lease with Chesapeake included the twenty acres at issue here. They repeatedly sought to be paid for that additional twenty acres, unsuccessfully. Mr. Barber admitted in his deposition that, if Chesapeake had paid him and his wife for the twenty acres at the time they discovered that they owned mineral rights to seventy-nine acres in Section 26, they would have accepted the payment.

> Q      So, really and truly, if Chesapeake had sent – well, I'm not trying to put words in your mouth. But if Chesapeake had sent you this $3,000.00 check several years ago, then you would have taken the check and we wouldn't be here today?
>
> A      There is a good possibility of it, yes.
>
> Q      So, the real issue that we are dealing with, as far as you are concerned, is the fact that it took them five years or longer to get it all sorted out?
>
> A      That's right.

Based on the deposition testimony, it is undisputed that the Barbers intended to lease to Chesapeake all of the mineral rights that they owned within Section 26, which accords with the plain language of the lease. At the time they signed the lease, the Barbers believed that they only owned mineral rights on fifty-nine acres, and they accepted payment based on that acreage. Within a few months after executing the lease, however, they learned that they actually owned mineral rights to seventy-nine acres. They believed at the time that they had leased all of the seventy-nine acres to Chesapeake, and they requested payment from Chesapeake for the additional twenty acres. Although there was a delay in securing payment from Chesapeake, the undisputed facts establish

that the parties intended the lease to include all of the mineral rights owned by the Barbers within Section 26. The defendants are therefore entitled to summary judgment on this issue.

## CONCLUSION

For the reasons stated, the defendants' motion for summary judgment is granted. Document #21. The unambiguous language of the lease and the testimony of Dewayne Barber establish that the Barbers and Chesapeake intended that the lease would include all of the mineral rights owned by the Barbers in Section 26, Township 9 North, Range 6 West, in White County, Arkansas. The undisputed facts also establish that the lease continued in full force and effect after the expiration of the primary term by virtue of the integration order entered by the Arkansas Oil and Gas Commission dated February 11, 2010 (Order No. 032-2010-01) and the subsequent drilling of the Peter Harmon 09-06 #1-26H well by SEECO, Inc., commencing on March 21, 2010.

IT IS SO ORDERED this 13th day of January, 2012.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE